IN THE SUPREME COURT OF NORTH CAROLINA

No. 217A19

Filed 14 August 2020

IN THE MATTER OF: E.J.B., R.S.B.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 15 March 2019 by Judge Faith Fickling in District Court, Mecklenburg County. Heard in the Supreme Court on 17 June 2020.

*Stephanie Jamison, Senior County Attorney, for petitioner-appellee Mecklenburg County Department of Social Services.*

*Law Office of Matthew C. Phillips, PLLC, by Matthew C. Phillips for appellee Guardian ad Litem.*

*Robert W. Ewing for respondent-appellant father.*

BEASLEY, Chief Justice.

On appeal, respondent-father asks this Court to vacate the trial court's order terminating his parental rights and remand the matter to the trial court for compliance with all requirements under the Indian Child Welfare Act (the Act).[1] Because we conclude that the trial court failed to comply with the Act's notice requirements and that the post termination proceedings before the trial court did not cure the errors, we remand the matter to the trial court so that all of the requirements of the Act can be followed.

---

[1] We use the terms "Indian" and "Indian child" to comply with the terminology used in the Indian Child Welfare Act.

I.      Background

The Mecklenburg County Department of Social Services (DSS) filed a juvenile petition on 7 April 2015, alleging that Eric and Robert[2] were neglected and dependent juveniles. The trial court entered a Non-Secure Custody Order on 7 April 2015, granting custody of the children to DSS. That same day, the DSS social worker contacted respondent-father, who denied being the children's biological father. The trial court held an initial seven-day hearing on 14 April 2015 and found that the Act did not apply. At the time of this hearing, respondent-father had not yet been served with the juvenile petition.

In preparation for the adjudication and disposition hearing scheduled for 3 June 2015, DSS filed a court summary report on 1 June 2015. The report included a section titled "Indian Child Welfare Act," which indicated that respondent-father "reported that he is affiliated with the Cherokee Indian tribe" but noted that "he has not provided this social worker with the necessary information to further investigate." The report also included the transcript from a Child and Family Team Meeting held on 4 May 2015, that quoted respondent-father as telling the team his "roots are Irish and Indian."

Respondent-father was personally served at the 3 June 2015 hearing, and the trial court found good cause to continue the matter until 12 August 2015. The

---

[2] Pseudonyms are used to protect the juveniles' identities and for ease of reading.

adjudication hearing was continued for good cause on 12 August 2015 and ultimately took place on 3 December 2015. The trial court adjudicated the children to be dependent juveniles, as defined by N.C.G.S. § 7B-101(9), and ordered that they remain in the custody of DSS.

The trial court held multiple permanency planning hearings until the trial court ultimately granted sole physical and legal custody to the children's biological mother on 2 August 2017. Seven additional DSS court reports filed prior to this hearing included respondent-father's statements about his affiliation with the Cherokee Indian tribe. The trial court converted the matter to a Chapter 50 civil custody action and terminated the jurisdiction of the Juvenile Court. Respondent-father gave notice of his appeal on 11 October 2017.[3]

While respondent-father's appeal was pending, DSS filed a second juvenile petition on 2 January 2018, alleging that the minor children were neglected and dependent juveniles. The trial court entered a Non-Secure Custody Order on 2 January 2018, granting custody of the children to DSS. The children remained in the custody of DSS throughout these proceedings. On 10 July 2018 the trial court

---

[3] The Court of Appeals issued a unanimous unpublished opinion on 1 May 2018 dismissing respondent-father's appeal from the trial court's order granting custody to the children's biological mother. *See In re E.J.B.,* 812 S.E.2d 911, 2018 WL 2016138 (N.C. Ct. App. 2018) (unpublished).

adjudicated the children neglected and dependent as defined in N.C.G.S. § 7B-101(9) and (15).

On 24 August 2018 DSS filed a motion to terminate respondent-father's parental rights. A termination hearing was held on 15 February 2019, at which the trial court found that respondent-father neglected the children as defined in N.C.G.S. § 7B-101(15), failed to make reasonable progress in correcting the conditions that led to the removal of the juveniles, and willfully failed to pay a reasonable portion of the cost of care for his children. The trial court concluded that it was in the best interests of the juveniles to terminate respondent-father's parental rights. Respondent-father filed his notice of appeal on 27 March 2019.

While respondent-father's appeal was pending before this Court, the trial court held post termination of parental rights hearings on 20 August 2019 and 18 February 2020, pursuant to N.C.G.S. § 7B-908. At the 18 February 2020 post termination hearing, the court made specific findings regarding compliance with the Act. The trial court found that, pursuant to the Act, notices had been sent to two Cherokee tribes in Oklahoma and one Cherokee tribe in North Carolina. Each notice had also been sent to the appropriate regional director of the Bureau of Indian Affairs.

Each relevant tribe was served by mail, with return receipt requested. As of 30 August 2019, the Eastern Band of Cherokee Indians and the Cherokee Nation tribes both replied and indicated that the children were neither registered members nor eligible to be registered as members of those tribes. The United Keetoowah Band of

Cherokee Indians tribe received the notice in August 2019 but failed to respond. Ultimately, the trial court found that the Act did not apply.

II.     Indian Child Welfare Act

In 1978 the United States Congress passed the Act, which established "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes" in order to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." 25 U.S.C. § 1902 (2018).

The Act was a product of growing awareness in the mid-1970s of abusive child welfare practices that led to an "Indian child welfare crisis . . . of massive proportions." H.R. Rep. No. 95-1386, at 9 (1978) (hereinafter House Report); *see also Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S. Ct. 1597, 1599–1600). Studies conducted by the Association on American Indian Affairs in 1969 and 1974, and presented during Senate oversight hearings in 1974, showed that between twenty-five and thirty-five percent of all Native American children were living in foster homes, adoptive homes, or institutions. *Miss. Band*, 490 U.S. at 32–33, 109 S. Ct. at 1600 (citing Indian Child Welfare Program, Hearings before the Subcomm. on Indian Affairs of the S. Comm. on Interior and Insular Affairs, 93d Cong., 2d Sess., 3 (statement of William Byler) (hereinafter 1974 Hearings)); *see also* House Report, at 9. Moreover, approximately ninety percent of Native American children removed

from their families were placed in non-Native American homes.[4] *Miss. Band*, 490 U.S. at 33, 109 S. Ct. at 1600 (citing 1974 Hearings, at 75–83). On the basis of extensive empirical and anecdotal evidence collected during congressional hearings in 1974, 1977, and 1978, Congress concluded that the "wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today," causing long term emotional harm for Native American children who lose their cultural identity,[5] mass trauma for Native American families,[6] and the erosion of tribal communities, heritage, and sovereignty.[7] *See* House Report at 9; *see also* Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,781 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23).

Although this crisis flowed from multiple sources, Congress found that state

---

[4] House Report, at 11 ("Discriminatory standards have made it virtually impossible for most Indian couples to qualify as foster or adoptive parents, since they are based on middle-class values.").

[5] 1974 Hearings at 27–28 (citing research showing that the majority of removed Native American children suffered identity confusion contributing to problems "in meeting the demands of adult life" and the "[d]evelopment of self-defeating styles of behavior and attitudes").

[6] 1974 Hearings at 28 (citing anecdotal evidence of "[g]rief of village parents, not only at their children's leaving home, but also at their children's personal disintegration away from home").

[7] Congress found that this "wholesale removal of Tribal children by nontribal government and private agencies constitutes a serious threat to Tribes' existence as on-going, self-governing communities," and that the "future and integrity of Indian tribes and Indian families are in danger because of this crisis." Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,781 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23) (alterations in original) (quoting 124 Cong. Rec. H38103).

agencies and courts were largely to blame for conducting unnecessary child removal and termination of parental rights proceedings. *See* Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38,779–80) (citing 25 U.S.C. 1901(4)–(5)); House Report at 10–12). During the 1978 hearings, Mr. Calvin Isaac, Tribal Chief of the Mississippi Band of Choctaw Indians and a representative of the National Tribal Chairmen's Association, summarized the consensus that had emerged regarding the principal cause of the crisis as follows:

> One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful [sic] of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child.

*Hearings on S. 1214 Before the Subcomm. on Indian Affairs and Public Lands of the H. Comm. on Interior and Insular Affairs*, 95th Cong. 2d 191–12 (1978).

Congress found that "in judging the fitness of a particular family, many social workers, ignorant of Indian cultural values and social norms, make decisions that are wholly inappropriate in the context of Indian family life and so they frequently discover neglect or abandonment where none exists." House Report at 10. "For example, the dynamics of Indian extended families are largely misunderstood. An Indian child may have scores of, perhaps more than a hundred, relatives who are counted as close, responsible members of the family. Many social workers, untutored

in the ways of Indian family life, or assuming them to be socially irresponsible, consider leaving the child with persons outside the nuclear family as neglect and thus as grounds for terminating parental rights." *Id.* Congress incorporated these sentiments into the congressional findings supporting the Act as follows:

> (3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . . .
>
> (4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and
>
> (5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901; *Miss. Band*, 490 U.S. at 35–36, 109 S. Ct. at 1601.

The Act governs child custody proceedings involving Indian children. Child custody proceedings include: (1) foster care placements; (2) terminations of parental rights; (3) preadoptive placements; and (4) adoptive placements. 25 U.S.C. § 1903(1)(i)–(iv) (2018). An Indian child is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). The Act further provides that:

> [i]n any involuntary proceeding in a State court where the court knows or has reason to know that an Indian child is involved, the party seeking the . . . termination of parental rights to[ ] an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.

25 U.S.C. § 1912(a) (2018). No child custody proceedings may occur until at least ten days after the receipt of the notice, and tribes may request an additional twenty days to prepare for the proceedings. *Id.*

Since its passage, the Act has helped stem the tide of the Native American child welfare crisis; however, the implementation and interpretation of the Act has been inconsistent, and Native American children are still disproportionately likely to be removed from their homes and communities. *See* Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778 at 38,784 (internal citations omitted).

In 2016, after finding that its nonbinding guidelines were "insufficient to fully implement Congress's goal of nationwide protections for Indian children, parents, and Tribes," the Department of the Interior issued binding regulations to promote the uniform application of the Act. Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38,782 (citations omitted). Specifically, the Department considered the promulgation of binding regulations necessary because "[s]tate courts frequently characterize the guidelines as lacking the force of law and conclude that they may depart from the guidelines as they see fit." *Id.*

In implementing binding regulations, the Department updated existing notice provisions and added a new subpart I to the regulations promulgating the Act. *See* 25 C.F.R. §§ 23.101–.144; *see also* Indian Child Welfare Act Proceedings, 81 Fed. Reg. at 38,867–68. The new regulations did not affect termination of parental rights proceedings that were initiated prior to 12 December 2016 but do apply to any subsequent proceeding in the same matter or subsequent proceedings affecting the custody or placement of the same child. 25 C.F.R. § 23.143.

Under subpart I of the current federal regulations, state courts bear the burden of ensuring compliance with the Act. *See* 25 C.F.R. § 23.107(a), (b); *In re L.W.S.,* 255 N.C. App. 296, 298 n.4, 804 S.E.2d 816, 819, n.4 ("We note that, now, it seems to be the case that the burden has shifted to state courts to inquire at the start of a proceeding whether the child at issue is an Indian child . . . ."). State courts must ask each participant in a child custody proceeding, on the record, whether that participant knows or has reason to know that the matter involves an Indian child. 25 C.F.R. § 23.107(a). The trial court must also inform the parties of their duty to notify the trial court if they receive subsequent information that provides reason to know the child is an Indian child. *Id.*

If the trial court has reason to know that the child is an Indian child, but lacks sufficient evidence to make a definitive determination, the trial court must:

> [c]onfirm, by way of a report, declaration, or testimony
> included in the record that the agency or other party used
> due diligence to identify and work with all of the Tribes of

> which there is reason to know the child may be a member (or eligible for membership), to verify whether the child is in fact a member (or a biological parent is a member and the child is eligible for membership) . . . .

25 C.F.R. § 23.107(b)(1). While the trial court is seeking this additional information, it must treat the child as an Indian child until it determines that the child does not qualify for that status. 25 C.F.R. § 23.107(b)(2). State courts should seek to allow tribes to determine membership because "[t]he Indian Tribe of which it is believed the child is a member (or eligible for membership and of which the biological parent is a member) determines whether the child is a member of the Tribe, or whether the child is eligible for membership in the Tribe." 25 C.F.R. § 23.108(a). This determination is committed to the sole jurisdiction of the tribe, and state courts cannot substitute their own determination regarding a child's membership for that of the tribe. 25 C.F.R. § 23.108(b). If a tribe fails to respond to multiple written requests, the trial court must first seek assistance from the Bureau of Indian Affairs. 25 C.F.R. § 23.1005(c). State courts can only make their own determination as to the child's status if the tribe and Bureau of Indian Affairs fail to respond to multiple requests. Indian Child Welfare Act Proceedings 81 Fed. Reg. at 38,806.

III.    Analysis

Respondent-father asks this Court to vacate each of the judgments and orders entered in this case because the trial court failed to comply with the mandatory notice requirements under the Act before terminating his parental rights. He argues that

his statements concerning his own Indian heritage were sufficient to trigger the notice requirements of the Act and that the trial court lacks jurisdiction because it failed to comply with said requirements. Petitioners moved to dismiss the appeal, asking this Court to hold that the post termination notices were adequate to cure the trial court's failure to provide notice in compliance with the Act, rendering moot respondent-father's arguments on appeal.[8] We conclude that the post termination notices failed to comply with the Act and therefore cannot cure the trial court's error.

Here, the record shows that the trial court had reason to know that an Indian child might be involved. In eight separate filings, DSS indicated in its court reports that respondent-father indicated that he had Cherokee Indian heritage. Respondent-father also raised his Indian heritage during a Child and Family Team Meeting, and his comments were included in a report filed by DSS with the trial court. Although the trial court had reason to know that an Indian child might be involved in these proceedings, the trial court failed to readdress its initial finding that the Act did not apply and failed to ensure that any Cherokee tribes were actually notified.

The trial court was required to ask each participant in the proceeding, on the record, whether that participant knows or has reason to know that the matter

---

[8] Although these notices and findings by the trial court were not in the record, this Court takes judicial notice of the actions by both DSS and the trial court during the post termination hearings. *See State ex rel. Utils. Comm'n v. S. Bell Tel. and Tel. Co.,* 289 N.C. 286, 287, 221 S.E.2d 322, 324 (1976) ("Consideration of matters outside the record is especially appropriate where it would disclose that the question presented has become moot, or academic, and therefore neither of the litigants has any real interest in supplementing the record.").

involves an Indian child and inform them of their duty to inform the trial court if they learn any subsequent information that provides a reason to know that an Indian child is involved. *See* 25 C.F.R. § 23.107(a).[9] The party seeking the termination of parental rights, DSS, was required to notify the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of the tribe's right to intervene. 25 U.S.C. § 1912(a).

Here, there is no evidence in the record that the trial court inquired at the beginning of the proceeding whether any participant knew or had reason to know that an Indian child was involved or informed the participants of their continuing duty to provide the trial court with such information. In an attempt to rectify its failure to comply with the notice provisions of the Act, Mecklenburg County Department of Social Services Youth and Family Services sent a notice, with return receipt requested, on 1 August 2019 to each federally-recognized Cherokee tribe[10]: the Eastern Band of Cherokee Indians; the Cherokee Nation and the United Keetoowah Band of Cherokee Indians. Each notice was also sent to the appropriate regional director of the Bureau of Indian Affairs. Included with each notice was a copy of the juvenile petition and nonsecure custody order filed 2 January 2018. On 9

---

[9] Because the proceedings stemming from the 2 January 2018 juvenile petition began after 12 December 2016, the trial court was required to follow the binding federal regulations in addition to the statutory provisions of the Act.

[10] *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 85 Fed. Reg. 5,462 (Jan. 30, 2020).

August 2019, a representative of the Eastern Band of Cherokee Indians tribes responded, indicating that the juveniles were neither registered members nor eligible to register as a member of the tribe. On 13 November 2019, a representative of the Cherokee Nation tribe responded, indicating that the juveniles were not "Indian children" as defined in the Act. Both tribes indicated they did not have the legal right to intervene in the matters. The United Keetoowah Band of Cherokee Indians tribe received the notice on 5 August 2019 and had not responded as of the 18 February 2020 post termination of parental rights hearing.

Although the trial court attempted to comply with the Act by sending notices to these tribes after respondent-father appealed to this Court, the notices failed to include all necessary information as required under 25 U.S.C. § 1912 and 25 C.F.R. § 23.111(d). The notices did not contain any language informing the tribes of their right to intervene in the proceedings, and we find no other evidence in the record that these tribes were notified of their right of intervention, as mandated in 25 U.S.C. § 1912(a).

We further conclude that the notices were legally insufficient because they failed to contain all necessary information. Pursuant to binding federal regulations, notices must also include the following information:

> (1) [T]he child's name, birthdate, and birthplace;
>
> (2) [A]ll names known (including maiden, married, and former names and aliases) of the parents, the parents' birthdates and birthplaces, and Tribal enrollment numbers

-14-

if known;

> (3) [I]f known, the names, birthdates, birthplaces, and Tribal enrollment information of other direct lineal ancestors of the child, such as grandparents;
>
> (4) [T]he name of each Indian Tribe in which the child is a member (or may be eligible for membership if a biological parent is a member); [and]
>
> (5) [A] copy of the petition, complaint, or other document by which the child-custody proceeding was initiated and, if a hearing has been scheduled, information on the date, time, and location of the hearing[.]

25 C.F.R. § 23.111(d)(1)–(5). Notices must also include statements setting out the

following:

> (i) [T]he name of the petitioner and the name and address of petitioner's attorney.
>
> (ii) [T]he right of any parent or Indian custodian of the child, if not already a party to the child-custody proceeding, to intervene in the proceedings.
>
> (iii) [T]he Indian Tribe's right to intervene at any time in a State-court proceeding for the foster-care placement of or termination of parental rights to an Indian child.
>
> (iv) [T]hat, if the child's parent or Indian custodian is unable to afford counsel based on a determination of indigency by the court, the parent or Indian custodian has the right to court-appointed counsel.
>
> (v) [T]he right to be granted, upon request, up to 20 additional days to prepare for the child-custody proceedings.
>
> (vi) [T]he right of the parent or Indian custodian and the Indian child's Tribe to petition the court for transfer of the

foster-care placement or termination-of-parental rights proceeding to Tribal court as provided by 25 U.S.C. § 1911 and § 23.115.

(vii) [T]he mailing addresses and telephone numbers of the court and information related to all parties to the child-custody proceeding and individuals notified under this section.

(viii) the potential legal consequences of the child-custody proceedings on the future parental and custodial rights of the parent or Indian custodian.

(ix) that all parties notified must keep confidential the information contained in the notice and the notice should not be handled by anyone not needing the information to exercise rights under [the Act].

25 C.F.R. § 23.111(d)(6)(i)–(ix). Upon careful review of the notices sent, we observe that the notices also failed to fully comply with these regulations.

The notices failed to include: (1) the children's birthplaces, as required by 25 C.F.R. § 23.111(d)(1); (2) notice of the tribe's right to intervene, as required by 25 C.F.R. § 23.111(d)(6)(iii); (3) notice of the tribe's right to request an additional twenty days to prepare for the hearing, as required by 25 C.F.R. § 23.111(d)(6)(v); and (4) notice of the tribe's right to petition for a transfer of the proceeding to tribal court, as required by 25 C.F.R. § 23.111(d)(6)(vi).

Each of the three notices sent by DSS failed to comply with the Act and were not sent in a timely manner. The Eastern Band of Cherokee Indians and Cherokee Nation tribes responded to their respective notices, indicating that Robert and Eric were not "Indian children" as defined in 25 U.S.C. § 1903(4). Based on these

responses, the trial court no longer had reason to know that Eric and Robert might be Indian children due to their affiliation with the Eastern Band of Cherokee Indians or Cherokee Nation tribes.

However, the trial court still had reason to know that Robert and Eric might be Indian children due to their affiliation with the United Keetoowah Band of Cherokee Indians tribe. The only notice that the tribe received was legally insufficient and it failed to comply with the Act because it did not contain all information required in 25 U.S.C. § 1912(a) and 25 C.F.R. § 23.111(d). Assuming, *arguendo,* that the notice was legally sufficient, the trial court still erred by finding that the Act did not apply because it failed to ensure that DSS used due diligence when contacting all three tribes. 25 C.F.R. § 23.107(b)(1). Tribes, not trial courts, determine whether a child is a member or is eligible for membership, and therefore considered an Indian child under the Act. 25 C.F.R. § 23.108. If a tribe fails to respond, the trial court must seek assistance from the Bureau of Indian Affairs prior to making its own independent determination. 25 C.F.R. § 23.105(c). This is because "[t]he State court may not substitute its own determination regarding a child's membership in a Tribe, a child's eligibility for membership in a Tribe, or a parent's membership in a Tribe." 25 C.F.R. § 23.108(b).

We therefore conclude that the post termination notice sent to the Keetoowah Band of Cherokee Indians tribe did not cure the trial court's failure to comply with the Act prior to terminating respondent-father's parental rights.

-17-

IV.    Conclusion

The order terminating respondent-father's parental rights is reversed. We remand this matter to the trial court to issue an order requiring that a notice be sent to the Keetoowah Band of Cherokee Indians tribe by DSS that fully complies with the requirements of 25 U.S.C. § 1912(a) and 25 C.F.R. § 23.111. If the Keetoowah Band of Cherokee Indians tribe indicates that the children are not Indian children pursuant to the Act, the trial court shall reaffirm the order terminating respondent-father's parental rights. In the event that the Keetoowah Band of Cherokee tribe indicates that the children are Indian children pursuant to the Act, the trial court shall proceed in accordance with the relevant provisions of the Act.

REVERSED and REMANDED.

Justice DAVIS did not participate in the consideration or decision of this case.

Justice NEWBY dissenting.

The ultimate question presented in this case is whether each child involved in this termination proceeding is an "Indian child" as defined by the Indian Child Welfare Act (ICWA). The specific question is whether the appropriate Indian tribes were notified of the allegation that the children were potentially of Indian heritage. While the Mecklenburg County Department of Social Services, Youth and Family Services (YFS) and the trial court did not timely investigate whether the ICWA applied, during post-termination proceedings YFS did provide notice to the three relevant Indian tribes and the respective directors of the Bureau of Indian Affairs. The notices were sent with return receipts requested, and all necessary entities received notification. Two tribes responded that the children were not eligible for membership. Although in receipt of the notification, the third tribe did not respond to the notice over a period of nearly seven months. The third tribe was notified through two separate avenues, to the tribe directly and to the regional director of the Bureau of Indian Affairs. Similarly, the Bureau of Indian Affairs did not respond. This information was presented to the trial court, and after evaluating all the evidence, it determined that the children are not Indian children. This determination rendered the ICWA inapplicable since the trial court had no reason to believe that the children were Indian children based on the tribes' responses, or lack thereof. Even if the notices to the tribes could have provided additional information about the tribes'

respective rights in the proceedings, that information is unnecessary unless the children are Indian children. As such, and because the trial court has properly made the determination that the ICWA does not apply here, the appeal should be dismissed as moot.

Under North Carolina law the guiding principle in termination of parental rights cases is the best interests of the child. Children are best served with timely proceedings and placements in permanent homes. As a result of the majority's decision, the children in this case must endure months of further uncertainty waiting for the last tribe to respond, if it will. If the children are Indian children, the last tribe would have responded already. Despite the seeming lack of interest by the third tribe and the Bureau of Indian Affairs, the majority places the burden of obtaining a response from the tribe on the trial court and YFS. The majority is also critical of the notice provided, saying that additional information should have been included. The majority assumes that Indian tribes are not motivated to respond if the research reveals the children's Indian heritage, or that tribes do not understand their rights. It uses these assumptions to keep these children embroiled in a continued, lengthy termination proceeding. Because the majority improperly elevates the form of the statutory notice requirements over the substance of actual notice, thereby undermining the best interests of the children, I respectfully dissent.

The children were initially placed with YFS in 2015, and after a series of proceedings in which the children's mother was awarded custody, she relinquished

her rights to the children in 2018. Ultimately, on 15 March 2019 the trial court terminated respondent's parental rights.

Though respondent informed YFS that he was "affiliated with the Cherokee Indian tribe," YFS did not investigate because it believed that respondent had not provided the information necessary to require further inquiry into the matter. On 1 August 2019, YFS sent notices to three Indian tribes and the Bureau of Indian Affairs, with return receipts requested as required by statute, informing them that the children were currently involved in dependency actions and that the children may be eligible for enrollment in one of the tribes. Upon receipt of the notice, two of the tribes responded that the children were not eligible for enrollment; as such, the tribes noted that they were therefore not legally able to intervene. The third tribe, the United Keetoowah Band of Cherokee Indians, signed the return receipt indicating that they received notice in August of 2019, but the tribe did not respond, and still has not responded, to the notice. The Bureau of Indian Affairs affiliated with the United Keetoowah Band of Cherokee Indians was also served and did not respond.

The trial court conducted two post-termination hearings. At the second hearing on 18 February 2020, based on the information set forth above, the trial court determined that the ICWA does not apply.

The ICWA provides that:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the . . . termination of parental

> rights to[ ] an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and their right of intervention.

25 U.S.C. § 1912(a) (2018). By its terms, this provision only applies when the court knows or should know that an Indian child as defined by the ICWA may be involved. According to the ICWA, an Indian child is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4) (2018).

In accordance with the regulations promulgated under the ICWA, state courts must generally ask parties involved whether the children at issue are Indian children. 25 C.F.R. § 23.107(a) (2019). If the trial court has reason to suspect the children are Indian children through any of the avenues recognized in 25 C.F.R. § 23.107(c), including an allegation of Indian heritage, then the trial court must confirm that the relevant state agency or other party involved in the proceeding has sought a determination of the children's tribal membership status by the appropriate Indian tribe or tribes. 25 C.F.R. § 23.107(b)(1). The trial court should treat a child as an Indian child unless it is determined that the child does not meet the "Indian child" definition. 25 C.F.R. § 23.107(b)(2). Ultimately, "[s]tate courts have discretion as to when and how to make this determination." Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,806 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23). Moreover, the regulations provide a ten-day waiting period for termination

proceedings to occur once a tribe has received notice, and the impacted tribe may request up to twenty days to prepare for the proceeding if an Indian child is in fact involved. 25 C.F.R. § 23.112 (2019). If the trial court determines that the children involved are not Indian children, then the ICWA does not apply. 25 C.F.R. § 23.107(b)(2).

These regulations place the burden on the trial court and Department of Social Services to determine whether a child is an Indian child when they have notice that an Indian child may be involved in the proceeding. While respondent here merely informed YFS that he had Cherokee Indian heritage, this information was sufficient to put the trial court and YFS on notice that the ICWA may apply. Therefore, the burden was on the trial court and YFS to investigate as soon as respondent provided this information.

While notice should have been provided earlier in the proceeding, YFS did ultimately provide notice to the three relevant Cherokee Indian tribes. The evidence arising from the notices was sufficient to allow the trial court to determine that the ICWA is inapplicable. The purpose of the ICWA is to notify the Indian tribes that a potential Indian child is involved in the state proceeding, not to delay termination proceedings based on unsubstantiated allegations of Indian heritage. Given the responses from two tribes, and the third tribe's failure to respond in the nearly seven months after it received notice, the trial court properly determined that the ICWA is inapplicable.

It appears that the majority would put the termination proceeding on hold awaiting an actual response from the third tribe which failed to respond even though it indisputably received notice. It seems this issue has already caused a significant delay and that further delay will now occur. Our case law has supported the idea that the best interests of the child should be the lodestar in juvenile proceedings. *See In re T.H.T.*, 362 N.C. 446, 448, 665 S.E.2d 54, 56 (2008) (recognizing the importance of effectuating a child's best interests and the need for children to be timely placed in a permanent home); *id.* at 450, 665 S.E.2d at 57 (stating that, because a child's perception of time differs from that of an adult, "[t]he importance of timely resolution of cases involving the welfare of children cannot be overstated"); *see also* N.C.G.S. § 7B-100(5) (2019). Also, this Court has consistently recognized that form should not be elevated over substance. *See, e.g.*, *In re A.P.*, 371 N.C. 14, 19–22, 812 S.E.2d 840, 844–45 (2018) (reading the juvenile code holistically to determine that, despite statutory language to the contrary, the legislature did not intend to limit the proper petitioner in a juvenile adjudication to a single individual within a department of social services, as a determination to the contrary would not achieve the best interests of the child); *In re T.L.H.*, 368 N.C. 101, 111–12, 772 S.E.2d 451, 458 (2015) (concluding that, though the trial court could have conducted an inquiry into respondent's competence at trial in light of her mental health conditions, the trial court had a reasonable basis for concluding that respondent was capable of participating in the proceeding since its conclusion rested on other legitimate

considerations); *In re J.T.*, 363 N.C. 1, 672 S.E.2d 17 (2009) (concluding that it would be unnecessary to address deficiencies in the summons, that the juveniles were not named in the petition as respondents nor was the summons served on a GAL, because the GAL fully participated in the proceedings despite any deficiency). Because the ultimate goal of juvenile proceedings is to determine and effectuate the best interests of the child, the proceedings in this case should not be invalidated over technical deficiencies.

Moreover, the majority seems to say that any allegation of Indian heritage, even one unsupported by anything more than a statement that a party has Indian heritage, is sufficient to halt all child proceedings so long as a tribe does not respond. This impractical approach does not appear to be the intent of the ICWA, nor is it consistent with our case law and statutes recognizing the paramount interest being the best interests of the child, which favors timely resolution of these already lengthy proceedings.

Instead of asking if the trial court had evidence that the unresponsive tribe received notice about the children and the state court proceeding, the majority renders the notice deficient because, in addition to the fact that the tribe failed to respond, the notice itself did not include information such as the children's birthplace or an explicit statement that the tribe had a right to intervene. The majority fails to indicate why these technical deficiencies had any impact on the notice here since the United Keetoowah Band of Cherokee Indians failed to respond well beyond the time

recognized in the federal regulations. As previously mentioned, two of the tribes who were given notice indicated a clear understanding of their rights, explicitly stating that the ineligibility meant they could not intervene in the proceeding. Moreover, those tribes were able to establish that the children were not eligible for membership in their tribes without being provided with the children's birthplace. Therefore, requiring additional notices to be sent in this case will only serve to delay the proceeding, which in turn delays permanency for the children.

In sum, the majority elevates form over substance, needlessly delaying indefinitely the permanency that would be in the children's best interests. Because the Indian tribes were all notified and the trial court, in consideration of the evidence, determined that the ICWA is inapplicable, this appeal should be dismissed as moot. I respectfully dissent.